UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
STANISLAW MISIEWICZ,

                         **REPORT &**
                         **RECOMMENDATION**

        Plaintiff,

                         08 CV 4377 (KAM)(CLP)

- against -

D'ONOFRIO GENERAL CONTRACTORS
CORP., et. al.

        Defendants.
-------------------------------------------------X

On October 28, 2008, plaintiff Stanislaw Misiewicz filed a complaint alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et. seq. and other statutes. Plaintiff alleged that he was paid less than the prevailing wages for projects he worked on as a construction laborer while he worked for a number of construction service companies managed partly by members of the D'Onofrio Group,[1] for a period of about five years from 2002 to 2007. (Compl.[2] ¶ 21). Plaintiff alleged a scheme involving subcontracting among the defendants to avoid paying prevailing wage rates to their employees. (Compl. ¶¶ 37-53).

After the case was filed and discovery was proceeding, plaintiff, without consulting his attorney, negotiated and entered into a purported settlement agreement with the defendants on October 2, 2009. Thereafter, on November 2, 2009, plaintiff's counsel, Robert Wisniewski, Esq.,

---

[1] The D'Onofrio Group refers to a number of related corporate and individual defendants: D'Onofrio General Contracting Corp., D'Onofrio Bros. Construction Corp., DLH Technologies, Diego Construction, Inc., Diego Maintenance, Inc., Jerry D'Onofrio, Vincent D'Onofrio, John D'Onofrio, Harry L. D'Onofrio, and Angela Barbara.

[2] Citations to "Compl." refer to the Complaint filed on October 28, 2008.

1

requested a hearing to determine the propriety of the settlement. The Court granted counsel's request and ordered a hearing to be held on December 19, 2009. The Order further directed plaintiff Misiewicz, defendant John D'Onofrio, and counsel for defendants, Gary Mueller, Esq., to appear and testify about the events surrounding the purported settlement. (Docket Entry # 78).

During the hearing, Mr. John D'Onofrio represented that he had reached an oral settlement with the plaintiff much earlier, in mid-February of 2009. (Tr. at 13, 15). At that time, the plaintiff had only requested three years guaranteed employment, but had not requested any additional monetary payment to settle the case. (Id.) Plaintiff, who was unemployed at the time, was rehired on February 23, 2009 and began working for Diego Construction, even though his case remained pending. At that time, defendant gave the plaintiff a letter to sign and send to his counsel, but plaintiff chose not to do so. (Tr. at 15). Plaintiff's counsel continued to litigate the case, filing a motion to compel discovery on July 31, 2009. Mr. Mueller, counsel for defendants, filed an affidavit in opposition to the motion to compel discovery on August 20, 2009, which suggests that defendants' counsel did not consider the case to be settled at that point. Thereafter, on September 2, 2009, Mr. Mueller also sent a letter to the Court regarding discovery demands made by the plaintiff.

At the same time, in an e-mail from Mr. Mueller to Mr. Wisniewski sent on August 28, 2009, Mr. Mueller informed plaintiff's counsel that the defendants believed the matter was settled when they offered the plaintiff three years employment and sponsorship into the Union. (Ex. 2). No monetary amount was to be paid to plaintiff in that agreement. (Id.) Although Mr. Mueller conceded that neither counsel was involved in the settlement negotiations and there was no written agreement detailing this purported settlement, he claimed that plaintiff was "re-hired

2

with the understanding that the case was settled. . . ." (Id.) Mr. Mueller also claimed in the e-mail that the plaintiff had reneged on the settlement terms by failing to dismiss the instant action and not notifying his counsel to drop the case. (Id.) It is undisputed that defendants never presented this purported February 2009 settlement agreement to the Court. (Tr. at 17).

On October 2, 2009, plaintiff's counsel Robert Wisniewski received a "release" informing him that plaintiff had agreed to settle the case with the D'Onofrio defendants in exchange for a three year contract to work for the D'Onofrio defendants beginning on February 25, 2009 at union pay rates, plus a payment of $50,000. (Ex. 1; Pl.'s Oct. 5, 2009 Letter at 1). This letter was drafted by counsel for defendants, Mr. Mueller, and sent to Mr. John D'Onofrio during Mr. D'Onofrio's meeting with the plaintiff on October 2, 2009, at which Mueller was not physically present. (Tr. at 44). Thereafter, plaintiff signed the letter and returned it to Mr. D'Onofrio, who sent a copy to Mr. Mueller, who in turn faxed it to Mr. Wisniewski. (Ex. 1). The letter was not signed by Mr. D'Onofrio. (Id.)

At the hearing, the plaintiff testified that he signed the letter agreeing to resolve the case in exchange for three years employment plus $50,000. (Tr. at 26). He testified that he reviewed the proposed release, written in English, for 5-10 minutes. (Id.) Although he does understand some English, plaintiff's native language is Polish and he required a Polish interpreter at the hearing. (Id. at 25, 37). Plaintiff testified that it was his idea to settle the case and that defendant, his employer, did not pressure him to settle the case. (Id. at 26). However, plaintiff later testified that he did not understand the difference between backpay and unpaid wages, nor did he understand what was meant by statutory damages, even though such terms appear in the release. (Id. at 37; Ex. 1).

3

The Court questioned the plaintiff at the time of the hearing, and asked, after informing him that he was not obligated to sign the agreement, if he would still sign the settlement if it was presented to him again. In response, the plaintiff said, "Whatever I decided back then, I would decide again." (Tr. at 38).

Mr. D'Onofrio also testified about the circumstances surrounding the settlement that he negotiated directly with the plaintiff. He testified that the plaintiff told him he wanted to settle the case, and Mr. D'Onofrio invited plaintiff to come see him after work. (Id. at 40). Mr. D'Onofrio testified that he asked the plaintiff what it would take to settle the case, and it was the plaintiff who offered the terms of three years guaranteed employment plus $50,000. (Id. at 40-41).

According to Mr. D'Onofrio, he contacted his lawyer, who prepared a letter addressed to Mr. Wisniewski for the plaintiff to sign, containing the terms of the settlement agreement. (Id. at 14, 41-42, 44; Ex. 1). Mr. D'Onforio gave the document to the plaintiff, explained it to him and the plaintiff signed it. (Tr. at 42). The document was not signed by Mr. D'Onofrio, however. (Ex. 1). After plaintiff signed the document, Mr. D'Onofrio had the document notarized and faxed it to his attorney, who thereafter sent it to Mr. Wisniewski. (Tr. at 41-42).

On March 24, 2010, the parties submitted a final settlement *in camera* for the Court's approval as required under the FLSA. See, e.g., Sampaio v. Boulder Rock Creek Developers, Inc., No. 07 CV 153, 2007 WL 5209390, at *1 (E.D.N.Y. Sept. 6, 2007). The final terms of the settlement include three years guaranteed employment for the plaintiff beginning on February 25, 2009 and lasting until February 23, 2012. The settlement agreement notes that the plaintiff has already been paid $50,000; therefore a payment of that sum is not promised in the settlement

4

agreement. The Agreement also provides that defendants shall use their best efforts to assist plaintiff in becoming a member of IronWorkers' Local 361. Although it is not mentioned in the settlement agreement, plaintiff apparently has already received such membership in the Union through the sponsorship of the defendant. (See March 22, 2010 Letter from Mr. Wisniewski). This detail was not contained in the October 2, 2009 letter agreement, but plaintiff apparently believed that he would also receive full membership into the Iron Workers' Local 361 Union when he agreed to settle the case with Mr. D'Onofrio. (March 1, 2010 Letter from Mr. Mueller). Indeed, plaintiff refused to sign the final settlement agreement until he received his official union card, signifying his acceptance into the Union. (March 8, 2010 Letter from Mr. Wisniewski).

## DISCUSSION

### 1. Legal Standard

#### a) Settlements in FLSA Cases

Stipulated settlements in a FLSA case must be approved by the Court in the absence of the direct supervision of the Secretary of Labor. See 29 U.S.C. § 216(c); Tuan Le v. Sita Information Networking Computing USA, Inc., No. 07 CV 86, 2008 WL 724155, at *1 (E.D.N.Y. March 13, 2008). Even though this is an individual action that was never certified as a collective action, it is still subject to Court approval. See id.; Sampaio v. Boulder Rock Creek Developers, Inc., 2007 WL 5209390 at *1.

To determine the fairness of a settlement under FLSA, "the court must consider whether the agreement reflects a reasonable compromise of disputed issues rather than a mere waiver of statutory rights brought about by an employer's overreaching." Tuan Le v. Sita Information

Networking Computing USA, Inc., 2008 WL 724155, at *1 (citing Lynn's Food Stores, Inc. v. United States, 679 F.2d 1350, 1354 (11th Cir. 1982)). The court must review settlements because there is a "fear that employers would coerce employees into settlement and waiver [of their claims]. Id.

Normally, a settlement is approved where it is the result of "contentious arm's-length negotiations, which were undertaken in good faith by counsel. . . .and serious questions of law and fact exist such that the value of an immediate recovery outweighs the mere possibility of further relief after protracted and expensive litigation." Reyes v. Buddha-Bar NYC, No. 08 CV 2494, 2009 WL 5841177, at *3 (S.D.N.Y. May 28, 2009). Furthermore, "courts may enter judgments on a basis that does not require full payment of liquidated damages after scrutinizing the proposed settlements for fairness." Elliott v. Allstate Investigations, Inc., No. 07 CV 6078, 2008 WL 728648, at *1 (S.D.N.Y. March 19, 2008).

When reviewing a FLSA class action settlement, a district court normally examines the following nine factors:

> (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a larger judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the risks of litigation.

Alleyne v. Time Moving & Storage Inc. 264 F.R.D. 41 (E.D.N.Y.,2010). Since this is not a class action, factors two and six do not apply in the instant action. In Sampaio v. Boulder Rock Creek Developers, Inc., the court approved a stipulated settlement brought under FLSA, noting "there is

little to no documentation of the hours that plaintiff worked each week, the parties differ widely as to the number of hours that plaintiff actually worked" and also considering "the respective burdens the parties face with respect to their claims and defenses." No. 07 CV 153, 2007 WL 5209390, at *1 (E.D.N.Y. Sept. 6, 2007). However, this case differs from normal stipulated settlements because in this case it was negotiated without the assistance of counsel for plaintiff, and the circumstances raise the very concern noted by the court in Tuan Le v. Sita Information Networking Computing USA, Inc., No. 07 CV 86, 2008 WL 724155, at *1 (E.D.N.Y. March 13, 2008)–namely, the fear that the employer will exercise undue influence on the employee.

2. Analysis

When plaintiff finally did sign the settlement agreement on October 2, 2009, he had already been re-employed by defendants for some seven months. Therefore, because the settlement agreement only guarantees employment until February 23, 2012, the defendants are only guaranteeing employment for another 2 years and five months. Under the terms of this agreement, during the duration of the employment period, plaintiff will be paid for a minimum of 40 hours a week, regardless if such work is available.

Even though the parties reached this understanding, and did not immediately notify the Court and counsel that the case had been resolved, plaintiff has had the benefit of employment since February 23, 2009 and will continue to remain employed until February 23, 2012.

Furthermore, while the Complaint does not allege a specific damage amount, defendants contend in an *in camera* letter sent to the Court on March 24, 2010 that plaintiff's counsel alleged that plaintiff was damaged in the total sum of $1,149,775.47. That total includes

$564,084.89 in actual damages, $233,660.95 to satisfy a FLSA penalty, $140,104.25 under the New York Labor Law, and $211,924.39 in interest. Defendants denied that plaintiff worked any overtime and further denied that he worked on any project requiring the payment of prevailing wages. Thus far, defendants have been unable to produce payroll records for all the projects alleged to have been worked on by plaintiff.

Defendants, however, claim that three years employment at union wages plus benefits has a value of at least $450,000.00. Along with the cash payment of $50,000, they allege the total settlement falls within the range of reasonableness.

Given the disputed issues of fact relating to plaintiff's wage claims, the uncertainty of finding complete employment and payroll records, the value of three years employment plus the cash settlement, and plaintiff's representation that he wished to accept the settlement, the Court respectfully recommends that the settlement be approved.

3. Attorney's Fees

The settlement agreement also contains an agreement to pay $35,220.30 in attorney's fees to Mr. Wisniewski by the D'Onofrio defendants. While an attorney has the right to make a separate application for fees in FLSA cases, see e.g. Estrella v. P.R. Painting Corp. 596 F. Supp. 2d 723 (E.D.N.Y. 2009), counsel has not done so in this case.[3] Attorney's fees in a FLSA settlement are also subject to Court approval. See 29 U.S.C. § 216(b); Cisek v. National Surface Cleaning, Inc., 954 F.Supp. 110, 111 (S.D.N.Y. 1997) (reviewing attorney's fees agreed to in

---

[3]However, attorneys need not be awarded fees solely on an hourly basis, and may also receive a percentage compensation in FLSA collective actions. See Alleyne v. Time Moving & Storage Inc., 264 F.R.D. 41, 60 (E.D.N.Y. 2010).

settlement for reasonableness); Jones v. Casey's General Stores, Inc., No. 07 CV 400, 2009 WL 6372583, at *6 (S.D. Iowa 2009) (approving attorney's fees equaling one-third of $5,000,000 settlement where the total fell below lodestar calculation); Zegers v. Countrywide Mortg. Ventures, LLC, 569 F. Supp. 2d 1259, 1261 (M.D.Fla. 2008) (stating that "even in the settlement context, it remains the Court's duty to see that a reasonable attorney's fee is paid by the Defendants" and declining to approve 40% contingency fee).

However, "[t]he FLSA does not require the court to assess the fairness of an agreed payment of attorneys' fees in settling an individual action. Indeed, the purpose of the fairness review is to ensure that an employer does not take advantage of an employee in settling his claim for wages, and not to ensure that the employee does not overcharge the employer." Dail v. George A. Arab Inc., 391 F. Supp. 2d 1142, 1146 (M.D. Fla. 2005) (approving settlement providing for $10,600 in attorney's fees and $6,400 in owed wages to plaintiff). "In an individual FLSA claim, where separate amounts are set forth for the payments of unpaid wages and payments for attorneys fees, the Court has greater flexibility in exercising its discretion in determining the reasonableness of the attorneys' fee." Id. In other words, there is a greater range of reasonableness for approving attorney's fees in an individual action where the parties settled on the fee through negotiation.[4]

In the absence of any records of hours worked, the Court cannot determine with precision what the fee might be. However, the Court is familiar with the discovery that has occurred to

---

[4] In the attorney's fees context outside FLSA, the Supreme Court has stated that "[i]deally, of course, litigants will settle the amount of [an attorney's] fee." Hensley v. Eckerhart, 461 U.S. 424, 437 (1983) (discussing fees awarded under the Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988).

9

date on the case, the conferences and correspondence with the Court, and plaintiff's counsel's efforts generally on behalf of his client and the Court finds that the amount is reasonable. Moreover, the Court is reticent to disapprove a settlement on the amount of attorney's fees, since both parties assumingly have knowledge of how attorney's fees are calculated in this district and were negotiating at arm's length. Furthermore, the attorney's fees were negotiated only after the defendant had agreed to pay the plaintiff $50,000 plus three years guaranteed employment. See Cisek v. National Surface Cleaning, Inc., 954 F. Supp. at 111. Therefore, the Court respectfully recommends that the amount of the attorney's fees be approved.

4. Standard for Attorney Communications with Adverse Party

During the hearing, plaintiff's counsel expressed concern that defendant's counsel may have engaged in an inappropriate communication with plaintiff without notifying plaintiff's counsel ahead of time. Attorneys arguing before this Court must abide by the newly implemented New York State Rules of Professional Conduct (the "Rules"), 22 N.Y.C.R.R. § 1200, which replaced the old Canons and Disciplinary Rules that were formerly in place in the State of New York. See E.D.N.Y. Local Rule 1.3. The New York Rules of Professional Conduct were revised and implemented on April 1, 2009.[5] To interpret the Rules, this Court may look to decisions of the New York State courts. E.D.N.Y. Local Rule 1.5(b)(5).

According to Rule 4.2, "In representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer

---

[5]The New York Rules of Professional Conduct, implemented on April 1, 2009, are available at: http://www.nysba.org/Content/NavigationMenu/ForAttorneys/ProfessionalStandardsforAttorneys/NYRulesofProfessionalConduct4109.pdf

knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law." N.Y. Rules of Prof. Conduct 4.2(a), 22 N.Y.C. R.R. § 1200.[6] However, a " a lawyer may cause a client to communicate with a represented person. . . .provided the lawyer gives reasonable advance notice to the represented person's counsel that such communications will be taking place." Id. 4.2(b). In this case, there was no such advance notice given to plaintiff's counsel.

Clients, of course, have the power to communicate with one another directly without the presence of counsel or without notifying counsel ahead of time. See New York Rules of Professional Conduct, Model Rule 4.2, Comment 11.[7] Furthermore, "[a] lawyer may properly advise a client to communicate directly with a represented person, and may counsel the client with respect to those communications." Id. The question remains here whether defense counsel crossed the line by drawing up an agreement and advising his client to obtain plaintiff's signature, after Mr. D'Onofrio and plaintiff had reached an oral agreement.

In this case, defendant's attorney did not communicate directly with the plaintiff nor was he involved in the initial settlement discussion between his client and the adverse party. However, it appears that defense counsel did advise his client to get a release of claims in writing after his client, Mr. D'Onofrio, told his attorney that he had reached an oral settlement with the

---

[6]Prior to New York's adoption of the Model Rules in 2008, New York had adopted Disciplinary Rule ("DR") 7-104(A)(1) of the ABA's Model Code of Professional Responsibility, which stated, "During the course of the representation of a client a lawyer shall not: Communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so."

[7]The rules are available at: http://www.nysba.org/Content/NavigationMenu/ForAttorneys/ProfessionalStandardsforAttorneys/RevisedNYRulesofProfessionalConduct.pdf.

11

plaintiff. (Tr. at 13). By producing the written document, a release of claims, and sending it to his client with the knowledge that his client would give it to the adverse party to sign, Mr. Mueller appears to have realized that his client would be communicating with another represented party. However, it appears that Mr. Mueller did not participate in negotiating the terms of the final settlement, which were agreed upon without his participation.

Nevertheless, even if such contact constituted overreaching, the plaintiff indicated at the hearing that he still believes in the terms of the settlement and would continue to sign it today even if he was not obligated to do so. Therefore, even if the Court felt the plaintiff could have obtained a better settlement through counsel, it is clear that plaintiff is no longer interested in litigating this case. While sanctions will not be imposed at this time, the Court admonishes defense counsel, Mr. Mueller, from advising his clients to enter into settlement negotiations directly with opposing parties, without notice to opposing counsel, especially where such a power imbalance in negotiating power exists.

## CONCLUSION

In accordance with the foregoing, the Court respectfully recommends that the parties' motion to approve the settlement be granted.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to mail copies of this Report and Recommendation to the parties.

**SO ORDERED.**

Dated: Brooklyn, New York
    May 17, 2010

                                            Cheryl L. Pollak
                                            United States Magistrate Judge